Good morning, ladies and gentlemen. We have four cases on the calendar this morning, three patent cases and a Veterans Appeal. The latter and one of the patent cases are being submitted on the briefs and therefore will not be argued. First case is EON-NET v. Ann Zimmerman v. FLAGSTAR BANCORP, 2009-13-08. Mr. Zimmerman. Good morning, Your Honors. May it please the Court, I'm representing the appellants EON-NET, myself and my former law firm Zimmerman & Levy in appealing the District Court's Markman rulings and sanctions orders. The District Court's claim construction should be reversed because the appellant's proposed claim construction of the existence of a computer file embodiment in this patent is clearly supported by the intrinsic record and the prosecution history. Likewise, the District Court's sanctions rulings should be reversed because they were erroneous and imposed as an abuse of discretion since the appellant's claim construction was not only reasonable but was proper and thus not overly broad. Mr. Zimmerman, let me just ask you something because I'm a little confused by the record. I was looking for the place in the record where the District Court made it clear that the sanctions order was against both counsel and client. There was a reference in one of the orders to the effect that neither EON-NET or its counsel conducted an appropriate pre-filing investigation, but ultimately the end of the judgment seems to just say I award fees to FLAGSTAR, so it's unclear. Right. At the end of the supplemental order on sanctions, Your Honor, they indicated that the court indicated it was reimposing the Rule 11 sanctions that were assessed in 2006 and overturned by this court in 2007, and it also indicated that it was finding this case to be an exceptional case in assessing sanctions against both myself and my client. Okay, so it's the second order? The supplemental order on sanctions, Your Honor. I'm trying to find it. So in that case, the judge, in the second order, the judge clarified the first order? Is that correct? I believe that's correct, Your Honor. Okay. I'm trying to find it here. I mean, I believe you. I assume you wouldn't— That's my recollection, Your Honor. —wouldn't take on sanctions lightly. No. I just didn't see it in the court's first order. Well, on refutal, you can come back and find that. Okay. Thank you. Mr. Zimmerman, isn't the substantive issue here whether the document in the claims is a hard copy document? That's correct, Your Honor. And hard copy is all over the specification. It is, Your Honor. And why do you maintain that the claim construction is hard copy? For several reasons. If you look at the sections that I cited in my reply brief, the specification, and I cited some of those sections in my opening brief as well, it makes clear that a hard copy document is only an example of the type of information that can be input into the system. I direct Your Honor, for example, to column 7, line 4554 of the specification. It says— How about the summary of the invention? Summary of the invention extracted from hard copy documents. It is also an object, hard copy. True. Constant, every one of these objects is hard copy. But I write in the summary of the invention at column 2, lines 29 to 37. It says it's another object of the invention to provide an application program interface which allows a user to input information which is to be transmitted into particular transmission format based upon the needs of the receiver of the information. There's no mention therein to hard copy document. I would direct Your Honor, not just to these sections that I've cited, column 4, lines 36 to 44 of the detailed description. Column 7, lines 45 to 54, which clearly states that information input from a hard copy document is just an example of the type of information. It also talks about inputting information from non-hard copy document sources such as a keyboard. Both types of information comprise an input document. If you look at figure 5, Your Honor— But if you read those in context, those references to the keyboard are references to how you process the data that you take off of the hard copy documents, isn't it? No, it's not, Your Honor. There are references to that, but it's not limited to that. It talks about using the keyboard to input information. For example, Your Honor, if you look at figure 5, this is the input document, and there are three sources, and if you read the description of figure 5, one is a scanner, the second is a character input, which is referenced as item 234 in the description, which is a keyboard, and then there's COM 4.0, which is a communication line, which is oftentimes implemented as a modem in the inventory. But doesn't figure 5 relate back to figure 1 and say that it describes the embodiment described in figure 1? Aren't all those figures that come after, aren't they referenced back? Don't they reference back to figure 1, which is clearly a hard copy document embodiment? Well, it talks primarily about a hard copy document. Again, I come back to the fact that the language in the specification makes clear that a hard copy document is only an example of the type of information that can be input, and I refer you to column 7, lines 45 to 54, which says, For example, if you read beginning of line 45, the character input module inputs textual information such as alphanumeric characters from an input device such as keyboard 234. The image input module inputs image information, for example, a digitized image of the actual appearance of a hard copy document. Both types of information, hard copy document and the non-hard copy document source of information from the keyboard, comprise an input document which is transmitted to information processing module 2.0. But again, each instance that it starts, the information that is being inputted is being gleaned from a hard copy document. Well, the information does not necessarily, in that specific example that you're referring to, in figure 1, it is. But this language is indicating that the information may not and does not have to originate as a hard copy document. That's why there's this language. And again, I will direct your honor to column 15, lines 18 through 30, which talks about other automated digitizing units can be used in addition to a scanner. And then the second sentence talks about any electrical, magnetic, or optical device which extracts information off the hard copy document. Then it goes, In addition, information can be input by user responses and digital and analog signals generated from various devices and from computer files from other computer systems. So the first two sentences are clearly talking about inputting information from a hard copy document source, whereas the latter two sentences state that the same information can be input from other computer files. And also, your honor, I would direct you to column 7, lines 31 through 35, that talk about this input process module and how that's used to process the information. And it talks about the output processing module and how both of them can access the communication interface. And it indicates a module is implemented in hardware, software, or a combination of hardware and software. So thus, the input process module, one can be implemented in software to input information into the system. A scanner is not input in software. A scanner is a piece of hardware. Mr. Zimmerman, I want to ask you about sanctions. Yes, your honor. The court said it was a frivolous lawsuit, accused your client of destroying evidence, noted an egregious example of cavalier attitude taken by the company and its principal, lack of regard for the judicial system. A whole series of items that led the court to issue a sanction. Yes, your honor. I think a lot of that stemmed from there was reference to questions during a deposition about access to documents. My client had moved around. He got divorced. He then moved overseas to Kenya. Certain things were lost. I did not prosecute these documents. What I indicated was back in 2002, I took over a case on the parent patents, the millennium patents, and in connection with that case, the case was resolved, and in cleaning up the file, I got rid of certain documents. There was reference to inventor notes, which I never had, which were never in there because I didn't prosecute the patents. The inventor notes were kept by the prosecution attorneys, Foley and Lardner. I indicated that afterwards, cleaning up the file, I discarded certain documents, and that really was the issue with regard to the destruction of documents. In fact, the appellees say that I destroyed or appellants destroyed all relevant documents, but that's not the case. If we had, we would not have been able to produce all the documents we sent them in connection with this case, the claim construction documents, the claim charts, licensing inquiries. I would also point out that the destruction of documents in this case occurred back in 2003 at the end of the read-off. It's not really destruction. It's cleaning up the files. We got rid of non-relevant documents. Public documents such as product information for the accused products, documents that were filed as pleadings with the court, but I kept all the non-relevant, I kept all the relevant non-public documents such as the license agreement and the settlement agreement. I'd point out that that happened in 2003. This patent issued in April of 2003. This patent issued in January of 2004, and this section was filed in 2005. At the time that I was involved in the Rees-Loft case, that was the first case I handled for this client. There was no contemplation. I was not aware that these patents were yet going to issue or that I was going to be involved in this action. But that doesn't change the fact that we were just cleaning up the file. There really was no destruction of documents. With respect to your client, putting aside what you might have known or when you came into the process, your client knows that it's essentially a business to litigate. That's correct. Filing serial lawsuits. So are we supposed to assume that there's no litigation hold, that you can simply discard documents and adopt a policy that says we never keep any single document, even though we know we're going to be engaged in serial litigation? Well, I would point out, Your Honor, and I think I pointed this out in brief, Mr. Medina may not keep any documents, but he made clear in his deposition testimony makes it clear that although he himself doesn't retain any of the documents, documents are kept by myself, by his accountant, and by the entities that created these businesses for him. And this is... But not substantial documents because virtually nothing was produced, right? Well, what was produced was all the documents I had from claim construction. The file history documents were produced. Those were documents that were produced by, that were maintained and kept by the firm that prosecuted the patents. I produced, to appellee, all the claim construction documents I had  from this case from other cases, licensing letters, discovery responses. In fact, that's how they found that discovery response, that they took exception to. Mr. Zimmerman, you wanted to save five minutes. You're well into your rebuttal time. You can either use it or save it. I'll save it, Your Honor. I would just point out that going back to the first issue about the support for the computer file embodiment, the patent office reviewed the Markman ruling from the district court after it issued. We gave it to them, and we actually pulled back a patent application that was pending that had been allowed. And they reviewed it, and they allowed these three continuation patents, that are the glory continuation patents, that have claims explicitly directed towards prosecuting information not derived from Scanhart copy documents. So, clearly, the patent office believes that there's support for this embodiment. Thank you. Thank you, Mr. Zimmerman. Ms. Bailey. May it please the Court. My name is Melissa Bailey, and I represent Flagstar in this case. I'd like to start with a discussion of claim construction. And on that subject, I'd like to just make a few comments about the specification and then address some of the arguments that Iannette raised for the first time in its reply brief. There are five portions of the specification that talk about the invention as a whole, the abstract, the summary of the invention, the background of the invention, and the start and finish of the section on the preferred embodiments. And each portion of the specification that I just referenced defines the invention as a whole, as a method for processing hard copy documents. Iannette's position is that the claims mean essentially the opposite of the definition of the invention as it's stated in the specification. The specification says the invention is processing hard copy documents. Iannette says the claims have nothing to do with hard copy documents. Iannette can't cite a case, and we can't find one, where the invention as a whole, not a preferred embodiment, but the invention as a whole is defined as X and the claims are construed to be the opposite of X. And, in fact, the cases say something entirely different, which is if the invention as a whole is defined as X, then the claims must be construed to encompass X. And we cited a number of those cases in our brief. But there are places in the specification that don't use the word hard copy. Mr. Zimmerman pointed out a third paragraph in the summary of the invention and portions of column 7. So the specification isn't totally devoted to hard copy, is it? Well, it is, Your Honor. I would say that even in places where the words hard copy document are not explicitly stated in the sentence, it is clear that the sentences are referring to hard copy documents. So I'll take as an example the third paragraph under summary of the invention, section 2, which is the only object of the invention listed that does not actually say the three words hard copy document in the sentence. But you'll note that that object of the invention directly corresponds with a problem with conventional systems that is at line 53, the sentence that begins at line 53 in column 1. And there it says another problem with conventional systems is that users, even within the same company, may require that the information extracted from a hard copy document be transmitted to a particular application program in a specific transmission format. And so the same substance is addressed in the object of the invention, even though it doesn't actually say the three words in that particular sentence. I'd also like to address the column 7 reference. And I'd like to just say that this argument was raised for the first time on reply, and so really it's waived because it wasn't raised in the district court and it wasn't raised in the opening brief. But I would like to address it because it really does show how E.N. Nett's arguments are completely divorced from what the specification actually says. So with respect to lines 45 to 54 in column 7, as has already been discussed, that language is discussing figure 5. And the language talks about textual information and image information and then states both types of information comprise an input document which is transmitted to information processing module 2.0. Now E.N. Nett wants this sentence to say each type of information can independently comprise an input to the system. But that's not what it says. It says that both types of information together comprise a single input to the system. Now this becomes very clear when you look at figure 5. And the other thing that becomes very clear when you look at figure 5 is that both the textual information and the image information is being derived from a hard copy document. So in figure 5 you have a scanner and you end up with an image copy and a text copy. Now what are those copies of? The only thing that they can be copies of is the original hard copy document. So there's nothing in this column 7 in figure 5 that supports E.N. Nett's claim constructions. And I would cite this as one other example of something that was raised for the first time in the reply brief, which also shows how divorced these arguments get from the specification. And that's E.N. Nett cites to figure 10 now in the reply brief. And it says in the reply brief that figure 10 shows quote, input information coming from other external devices instead of documents input at a scanner. But figure 5 doesn't show any input at all. It's showing the output of the invention. And figure 10 is, I'm sorry, I might have said figure 5 in that last sentence and I meant figure 10. Figure 10 is described at the bottom of column 9 as showing the output from the system. So this is just another example of how misplaced E.N. Nett's arguments have gotten. I'd also like to address the modem issue, the communication interface 4.0 that was discussed in the reply brief and that Mr. Zimmerman just discussed. So again, there's nothing about the use of a modem that says anything about the information that can or can't be processed by the invention. So the modem is actually depicted in a lot of the figures in the patent including figure 10, which talks about the output of the invention. And so figure 10 shows that a document can be output through a modem. Figure 9 actually also shows that information once it's extracted from a hard copy document can be transmitted through a modem to an application unit. And so by the same logic, perhaps a hard copy document, a scanned one, can be transmitted through a modem to the processing system. But the fact that there's a communications interface there, a modem, doesn't say anything about what kinds of information can or can't be processed by the invention. So I'd like to say just a few words about the Millennium patents because nothing in those patents supports EONET. Why don't you address the arguments on sanctions? Okay. So with respect to Section 285, I'd first like to say that that ruling can be upheld solely based on the district court's finding of misconduct in this case. So the district court found, as Your Honor has noted, that EONET destroyed documents on purpose and in anticipation of filing cases like this one. And the district court was in the best position to make that determination because it had the benefit of the videotaped deposition of Dr. Medina and experience with EONET in its courtroom for four years. You didn't rely on 285 the first time around, correct? You only relied on Rule 11? That's correct, Your Honor. Okay. So the first portion of the sanctions are purely a Rule 11 sanction? The sanctions issued the first time around were Rule 11 sanctions only. And then when the judge reinstated them, he reinstated Rule 11 sanctions and then only addressed 285 as it related to the post-reban litigation. Is that right? That's correct, Your Honor. Okay. The destruction of documents, Mr. Zimmerman didn't really focus on the fact that there was actually an ongoing document destruction policy at EONET that no documents were retained. And there's nothing to suggest, as Mr. Zimmerman does, that instead of retaining documents, EONET was giving them to its counsel. The documents were not retained by anybody once they were in the possession of EONET. So what was ultimately produced in discovery, just public documents? That's right, the public prosecution histories and then all of EONET's licensing letters to all kinds of different defendants telling them that they infringed the patents and the licenses that were actually entered. So there were no notes or emails or drafts or anything? No, Your Honor. And also the discovery response in the Burlington Co-Factory case actually wasn't produced by EONET either. We got that through a joint defense agreement with Burlington Co-Factory. So we think that the district court's order about the destruction of documents and about the other misconduct and unprofessional conduct in this case is sufficient to support the Section 285 ruling. The exceptional case ruling can also be upheld on the ground that EONET's claim construction positions were frivolous. In this case, the specification actually precluded in the most straightforward way possible EONET's claim construction positions when the invention is defined as X in the specification and the patentee is arguing that the claim should be construed as exactly the opposite of X, that it's just not objectively reasonable. But we get a lot of arguments like that, that the specification shouldn't be limited, that the claim shouldn't be limited to certain things in the specification. That's not sanctionable. Well, I would argue that the argument that the claim should not be limited to a preferred embodiment might be viable. The argument that the invention should be the opposite of what the invention is defined as in the specification, we would argue, is sanctionable. We also know in this case how EONET came up with its claim construction positions. And we know that they were created without any reference to the law or to the specification. Dr. Medina testified that he came up with the constructions by thinking about what was in his mind when he wrote the claims of the EONET patents in 1999. But what was in his mind has nothing to do with claim construction, and nothing in 1999 has anything to do with claim construction because the critical date for these patents is 1991. And so there's really nothing objectively or subjectively reasonable about how these claim construction positions were arrived at. And, in fact, it appears that the law was entirely ignored and the specification was entirely ignored. I'd also like to say just something quickly about this Court's prior decision in this case. EONET has been arguing that this Court essentially blessed its claim construction positions as at least being reasonable when it remanded this case for claim construction proceedings. And all the Court really said in its prior opinion is, look, EONET is making an argument on claim construction, and the district court should hear it. To issue that ruling, the Court didn't have to analyze EONET's position in light of the specification, and we don't believe that it undertook a full analysis of EONET's position in light of the specification. And this Court did not have all the evidence that the district court ultimately considered, such as EONET's admission that no intrinsic evidence supports some of its constructions and EONET's admission that the law wasn't even considered in coming up with its constructions. So we don't think anything about the prior ruling in this case precludes the district court's findings on Section 285. I'd like to say something about Rule 11 as well. Yeah, do you agree that it is absolutely clear in the record that the Rule 11 sanctions were intended to be against both EONET and its counsel? I do believe, Your Honor, and I as well could probably find the reference, but I believe that the Section 285 sanctions were issued in the first order, and that in the second order, when the judge reinstated the Rule 11 sanctions from the prior order, that those were directed at EONET's counsel. Okay. And I'd like to say about Rule 11 that it's very clear from the record that Dr. Medina, who is not a lawyer, was the architect of the claim construction positions in this case. And it's also very clear that he came up with those positions without talking to any lawyers, including his own. He admitted that at his deposition. So in connection with the other deposition testimony, which I have already discussed, it's clear that Dr. Medina also didn't refer to the law and didn't have any notion of what the relevant law is and didn't refer to the specification in coming up with the claim construction positions. And the Burlington Coat Factory discovery response is just another data point that shows that Dr. Medina was driving the ship, as he would say, and that he had no... That's how he said it in his deposition. That his approach to claim construction just was not tied to the law, and this is where a lawyer needs to step in. Mr. Zimmerman had an independent obligation to review the claims that Dr. Medina was asserting and to make sure that they were legally tenable. And there's no evidence that Mr. Zimmerman did that. And so we would submit that it was not an abuse of discretion to award the Rule 11 sanctions in this case and that that should be affirmed as well. That's all I have. Thank you. No one is ever penalized by not using all of their time. Mr. Zimmerman, you have a little rebuttal time. Thank you, Your Honor. A couple of things real quickly. Going back to Figure 5, I don't know if you see this arrow, an input document. And there's no discussion, as Ms. Bailey just talked about, how these things are combined together to be processed. This clearly shows information input from communication line 4-0 input and then processed. That's why the claim says document or file on a computer. That's why the claims in the second and 30 on that patent, the 697...not the 697, 673 and 162 patents, don't mention hard-copy documents. The first patents, the Millennium patents, all those claims explicitly recite hard-copy documents. None of the claims in these last two patents mention it, and none of the claims in the Glory Continuation patents. In fact, the Glory Continuation patents explicitly say processing information not derived from scanned hard-copy documents. But I guess part of my comment that you can see that Figure 1 and the preferred embodiment is a hard-copy document mechanism. Putting aside all these other arguments about definitions of what the invention is, Column 7 says Figures 4-10 illustrate the flow of data in the Figure 1 preferred embodiment. So Figure 5 is subsumed within this description of the preferred embodiment, is it not? It is preferred embodiment, but the claims are not limited to the preferred embodiment because the claims also incorporate elements showing, in the language of the claims that were allowed, incorporate language that was in the specification that indicates information can come from non-hard-copy document sources. So that's really my point about the claim construction and the fact that claims were allowed and, in fact, are enabled, and that's why it says document or file on computer. If document and file were the same thing, both hard-copy documents, then one would be superfluous. With regard to the destruction of documents, a couple of things I take issue with. Did you prep your witness before he was deposed? I did. Unfortunately, my client is a… Loose cannon? Yes, Your Honor. That's how I put it. So sometimes clients are difficult to control, and Mr. Medina is no exception. As far as what was produced, this is not true. We produced claim charts. That was non-public documents and information that we produced to appellee. And as far as the E.O.N.Net response in the Burlington Code Factory, that was produced by us, not something that was obtained through a joint discovery agreement. And I would also, with regard to Medina and E.O.N.Net… It was produced by you after they specifically requested it. In response to claim construction, discovery was limited solely to claim construction issues. And in response to that, we produced responses that we sent to other defendants in other cases E.O.N.Net had litigated. So those are not public documents. We sent claim charts. Those are not public documents. So the other thing I would bring to your attention, Your Honor, is that in response to Mr. Deposition's question about Mr. Medina, where he testified there was nobody else to ask and no place to look in response to whether he looked for documents requested by Flagstar, that was just confirmation that his documents were retained by the attorneys, accountants, and registered agents and I would direct you to A3083, lines 9 through 15, and A3072 through A3074, paragraphs 2, 3, 4, and 9, which make clear that was E.O.N.Net's policy. He didn't keep anything. It was his agents, his attorneys, and his accountants who kept stuff. Thank you, Mr. Zimmerman. Thank you, Your Honor. The case, your time has expired. We will take the case under advisement.